**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| VIA VADIS, LLC, and | § | |
| AC TECHNOLOGIES, S.A., | § | CASE NO. 1:14-CV-00810-LY |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| BLIZZARD ENTERTAINMENT, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' RESPONSE TO BLIZZARD'S MOTION TO EXCLUDE TESTIMONY OF EXPERT PHILIP GREEN

# TABLE OF CONTENTS

I.     SUMMARY OF THE ARGUMENT ................................................................. 1

II.    FACTUAL BACKGROUND ......................................................................... 1

III.   OVERVIEW OF MR. GREEN'S METHODOLOGY AND OPINION .......................... 3

IV.   LEGAL STANDARDS ............................................................................... 4

V.    ARGUMENT ........................................................................................ 5

     A.   Mr. Green's Royalty Base Opinions Do Not Include Non-Infringing Use ........... 5

          1.   Mr. Green's Analysis of Blizzard Users in the Lump Sum Royalty Base is Reliable ....................................................................... 5

          2.   Mr. Green's Analysis of the Time Period in the Lump Sum Royalty Base is Reliable ........................................................... 9

     B.   Mr. Green's Reliably Applies the BitTorrent and µTorrent Benchmarks to the Facts of this Case in Determining the Lump Sum Royalty Rate ......................... 12

          1.   Mr. Green's Standard Becnhmark Methodology Reliably Applies Sufficiently Comparable Benchmarks ..................................... 12

          2.   Mr. Green Correctly Apportioned to the Use of the Infringing Technology. ......................................................................... 14

          3.   Mr. Green's Profit Allocation is Reliable ................................. 15

     C.   Mr. Green Testimony Regarding Game Sales is Methodologically Sound and Not Excludable on *Daubert* Grounds. ................................................. 16

VI.   CONCLUSION .................................................................................... 17

# TABLE OF AUTHORITIES

Cases

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014)............................................................................... 6, 12

*Aqua Shield v. Inter Pool Cover Team*,
    774 F.3d 766 (Fed. Cir. 2014)................................................................................. 8, 10

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017)..................................................................................... 14

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015)....................................................................................... 8

*Bd. of Regents, The Univ. of Texas Sys. v. Ethicon, Inc.*,
    No. A-17-CV-001084-LY, 2020 WL 3580148 (W.D. Tex. Apr. 21, 2020)............................ 15

*Content Guard Holdings, Inc. v. Amazon.com, Inc.*,
    No. 2:13-CV-1112-JRG, 2015 WL 11089749 (E.D. Tex. Aug. 6, 2015)................................ 14

*Enplas Display Device Corp., et al. v. Seoul Semiconductor Co., Ltd.*,
    909 F.3d 398 (Fed. Cir. 2018)......................................................................................... 8

*Evolved Wireless, LLC v. Apple Inc.*,
    No. CV 15-542-JFB-SRF, 2019 WL 1178517 (D. Del. Mar. 13, 2019) .................................. 9

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983)....................................................................................... 8

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)............................................................................... passim

*In re Maxim Integrated Prod., Inc.*,
    No. 12-244, 2015 WL 5311264 (W.D. Pa. Sept. 11, 2015)..................................................... 17

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
    385 F.3d 1360 (Fed. Cir. 2004)......................................................................................... 9

*Interactive Pictures Corp. v. Infinite Pictures*, *Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)............................................................................. 8, 10, 11

*Kaufman v. Microsoft Corp.*,
    No. 16 CIV. 2880 (AKH), 2021 WL 242672 (S.D.N.Y. Jan. 25, 2021) ........................ 8, 14, 16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)................................................................................................ 5

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).......................................................................... 9, 10

*Micro Chem., Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003)........................................................................ passim

*Pers. Audio, LLC v. Apple, Inc.*,
  No. 9:09CV111, 2011 WL 3269330 (E.D. Tex. July 29, 2011).............................. 11

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)......................................................................... 5, 16

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)............................................................................. 13

## I.    SUMMARY OF THE ARGUMENT

Blizzard argues that the opinions of Plaintiffs' damages expert Philip Green should be excluded under Rule 702 and *Daubert* because he did not verbatim follow a certain prior methodology, unreliably calculated the royalty base and royalty rate, and possibly relied on Blizzard's sales of computer games.  To the contrary, Blizzard mischaracterizes Mr. Green's testimony, misstates the methods on which Mr. Green relies, and fails to address the inherent differences between a running and lump sum royalty.  Mr. Green's opinions should not be excluded because:

- Mr. Green's model follows established precedent to account for the economic footprint of the '521 Patented technology, and estimate the royalty base for a lump sum royalty in light of the extent Blizzard's anticipated use and availability of use of the patented methods;

- Mr. Green's use of the BitTorrent[1] and µTorrent benchmarks is sound, Federal Circuit-guided methodology supported by technical and economic analysis showing their reasonableness; and

- Mr. Green's consideration of Defendant's computer game sales information does not directly factor into his royalty rate or royalty base calculations and is methodologically appropriate.

Each of Blizzard's criticisms goes the weight and not admissibility of Mr. Green's opinions.

## II.    FACTUAL BACKGROUND

Blizzard is assumed to infringe the '521 Patent Methods, by using BitTorrent, as "seeded" by Content Delivery Networks (CDNs) to distribute files for its computer game titles (e.g., its World of Warcraft franchise.)   Ex. 1, Green Rep. at ¶¶ 47-9. BitTorrent is a peer-to-peer distribution technology in which peers upload to and download from other peers in the network. Dkt. 184 at 4-5.  BitTorrent also includes distribution by peers referred to as "seeds," "Web seeds,"

---

[1] BitTorrent here refers to the BitTorrent peer software, sometimes referred to as BitTorrent Mainline, as distinguished from the BitTorrent Protocol, which the BitTorrent peer software implement.

or "HTTP seeds" that have all of the data to be distributed and only upload.[2]  Dkt. 184 at 4-6; Ex.

2 at 76:19-78:5 (describing use of Blizzard Downloader CDN seeders.)  Thus, whether a Blizzard

peer obtained all or part of its data from a CDN, that peer participated in infringement as to that

data (at least) by storing it as a "data storage means" when connected to the swarm.[3]

Blizzard began practicing the methods of the '521 Patent in connection with launching its

World of Warcraft franchise in 2004.[4]  Blizzard's use of the infringing method eventually

expanded to StarCraft II, Diablo III, Hearthstone, as these titles were released, and legacy titles

including Warcraft III and others.  Ex. 1 at ¶ 3, Exhibit I.  Blizzard's Downloader (and later Agent)

shipped with BitTorrent functionality turned on as a default.  Ex. 1 at ¶ 10, n. 10; Ex. 2 at 60:10-

20. In February 2006, Blizzard touted the technology to its customers, stating:

> By using the Blizzard Downloader, the user is not limited by any one host's capabilities –
> instead the files are distributed across a wide range of users, allowing for a quicker
> download for everyone.  By using the upload capabilities of each downloader, the overall
> file distribution is much more efficient for everyone.

Ex. 3 at VIAVADIS002896.  Blizzard also stated that "the more users there are downloading the

file, the faster everyone's individual download speed will be." *Id*.  Blizzard repeatedly told its

customers that turning off the BitTorrent functionality in the Blizzard Downloader would "reduce

the potential download speed, since it is not as fast as peer-to-peer."  *Id.* at VIAVADIS002896,

VIAVADIS002893.  Blizzard discouraged use of direct download with BitTorrent disabled,

referring to it as the "alternative download method."  *Id* at VIAVADIS002896.  Blizzard further

discouraged direct download to its customers by stating that "[d]ue to the incredible popularity of

---

[2] "Seeding" refers to the seeds' distribution of pieces to the BitTorrent peers, who can further exchange the pieces among themselves.
[3] This infringement occurred whether or not the CDN's themselves were "data storage means."
[4] Blizzard did not infringe the Asserted Methods until February 14, 2006, when the '521 Patent issued.

our games, buying enough bandwidth to deliver large amounts of content to users as fast as they can download it is simply not an option." *Id.*

## III.    OVERVIEW OF MR. GREEN'S METHODOLOGY AND OPINION

To form his expert opinion, Mr. Green applied the well-recognized *Georgia-Pacific* "hypothetical negotiation" framework to determine reasonable royalty damages in this matter. Ex. 1 at ¶¶71 & Exhibits C - D-1.[5]  Both Ms. Kindler (Blizzard's damages expert) and Mr. Green agree that the hypothetical negotiation would have occurred in or around February 2006. Ex. 1 at ¶ 71; Ex. 4, Kindler Rep. at ¶ 38.  Ms. Kindler and Mr. Green also agree that the royalty would have been structured as a lump sum as opposed to a running royalty. Ex. 1 at ¶ 72; Ex. 4 at ¶ 87.[6]  As a lump sum analysis, Mr. Green took into account Blizzard's anticipated use and the value to Blizzard of the patented invention in February 2006. *See e.g.*, Ex. 1 at ¶¶48; 218-240; 271-276.

Mr. Green's reasonable royalty analysis considered each of the *Georgia-Pacific* factors, such as Blizzard's expected and actual benefits from the use of the patented technologies, including without limitation, Blizzard's expected cost savings. *See generally*, Ex. 1 at ¶¶74-294. Mr. Green also followed standard methodologies endorsed by the Federal Circuit by considering benchmark market pricing for technology comparable to that claimed in the '521 Patent. *See id.* at ¶¶ 244 – 257; 266.  The BitTorrent software benchmarks had availability in an advertising supported form in 2006 and were later sold in an ad-free format at a price of $4.95 per user per year. *Id* at ¶¶244-250.[7]  These were the same products offering the same functionality but were simply monetized differently at different points in time. Ex. 1 at ¶¶244-250.  Mr. Green applied a technical

---

[5] Mr. Green devotes 50 pages of his report to an analysis of all of the *Georgia-Pacific* Factors.
[6] Mr. Green's opinions regarding reasonable royalties are summarized in ¶¶ 291-294 of his report.
[7] Mr. Green's discusses his use of the BitTorrent and μTorrent benchmarks, which were software products of BitTorrent, Inc., in ¶¶244-257 of his report.  For ease of explanation, this brief collectively refers to them as the "BitTorrent" benchmarks.

apportionment that relies on input from Plaintiffs' technical expert, Ms. Frederiksen-Cross—which Blizzard has not sought to exclude—and further reduced the benchmark market price to account for Blizzard's implementation costs and contributions. *Id* at ¶¶252-256. This analysis provided Mr. Green's determination of the market price (including to Blizzard) allocable to the patented technology. *Id* at ¶ 256.

Mr. Green's calculation of the lump sum royalty included a per user, per year royalty rate and the estimated forecast of annual users as of February 2006. *Id* at ¶¶ 266-267. Consistent with Blizzard's produced licenses in this matter, Mr. Green determined that Blizzard would seek to license and anticipated use of the patented technology through the patent's life until expiration. *Id* at ¶¶ 105, 107, 116, 120, 125, 129, 134, 139, 144, 150, 157, 161, 165, and 267. He applied discount rates ranging from 11.5% to 30% to address uncertainty regarding the extent of potential usage of the patented technology, as is common practice in the preparation of financial forecasts. *Id* at ¶¶ 269-275. The higher discount rates reflect adjustments for perceived greater risk (i.e., less continued future use or even discontinuation of use). *Id* at ¶¶ 269-275. The analysis yielded a range of reasonable potential lump sum royalty outcomes. *Id* at ¶¶ 269-275. Based on his consideration of all of the *Georgia-Pacific* factors, Mr. Green concluded that a royalty consistent with the upper half of the range of data points would be agreed to by the parties at the hypothetical negotiation. *Id* at ¶¶ 290-292.

## IV. LEGAL STANDARDS

Federal Rule of Evidence 702 provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003). "The *Daubert* inquiry is 'a

flexible one' and that the analysis will depend on the nature of the issue, the witness's expertise, and the subject of the testimony." *Id. citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). "When … the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

## V.    ARGUMENT

### A.    Mr. Green's Opinions Regarding the Royalty Base for a Lump Sum Do Not Include Non-Infringing Use

#### 1.    Mr. Green's Analysis of Blizzard Users in the Royalty Base for a Lump Sum is Reliable

Blizzard argues that Mr. Green's consideration of Blizzard users in ¶ 267 should be excluded because Mr. Green does not reliably apply his principles and methods to the facts of the case in calculating his purported royalty base. Dkt. 192 at 12. Each of Blizzard's grounds for exclusion fail as they rely on mischaracterization of Mr. Green's opinions and improper legal foundation.

***First***, Blizzard asserts that Mr. Green does not even follow the methodology set out in *Summit 6* that Blizzard claims he used in his report.[8] *See Summit 6, LLC v. Samsung Elecs. Co.* 802 F.3d 1283 (Fed. Cir. 2015). Here, Blizzard attacks a straw man of its own making with its *Summit 6* argument. Mr. Green relied on the guidance in *Summit 6* as to one high-level and discrete issue, noted twice in his report: "a royalty can be determined by 'valu[ing] the infringed features based

---

[8] This argument is response to Blizzard's *Summit 6* stratagem in each place Blizzard repeats it throughout its Motion. For conciseness, it is not repeated in this Response.

upon comparable features in the marketplace.'" *Id.*; Ex. 1 at ¶ 68; Ex. 5, Green Dep. at 32:5-15. This passage in *Summit 6* describes at the highest level three avenues for estimating a reasonable royalty—the quoted language being one. Mr. Green explained that in the specifics of his benchmark analysis he followed the Federal Circuit guidance from similar analyses in *i4i Limited Partnership v. Microsoft Corp.*, No. 09-1504 (Fed. Cir. 2010) and *Apple Inc. v. Motorola, Inc.*, Nos. 12-1548, -1549 (Fed. Cir. 2014). Ex. 1 at ¶ 244 & n. 341; Ex. 5 at 36:9-21. At deposition, Blizzard did not ask Mr. Green questions about these other cases to create the apparent misimpression that he was relying extensively on *Summit 6* for his approach (when he was not— and explained so from the outset), but then improperly deviated from it for the details of his analysis. This argument is not grounds for excluding his testimony, and if anything goes only to the weight of his opinions.

**Second,** Blizzard asserts that Mr. Green improperly included Blizzard's entire user base without considering users who (a) opted out of using the accused peer-to-peer functionality or (b) downloaded data by CDN even when connected to the swarm. Dkt. 192 at 9. To the contrary, Mr. Green further expressly considered the anticipated extent of use in his analysis of how the parties would determine a lump sum such that his opinions are admissible. As described above and in Plaintiffs' infringement report, Blizzard's CDNs participated in infringement as Web Seeds/HTTP Seeds, and the Blizzard peers are "data storage means" for the pieces obtained from the CDNs while connected to the Blizzard swarm. Ex. 1 at ¶ 48.[9] And Blizzard does not dispute that its Blizzard peer software connected to the Blizzard BitTorrent swarm as the default mode. Blizzard's YouTube video example further illustrates how this relates to infringement—the Blizzard user

---

[9] Blizzard's citations to ¶¶192, 195, and 201 of Mr. Green's report are unavailing as they address *Blizzard's assertion* that CDNs are a non-infringing alternative. Compare Ex. 1 at ¶ 48 (addressing CDN participation in infringement as seeds.)

already participated in infringement (downloading with a Download Rate of 34.00 kb/s and uploading with an Upload Rate of 6 kb/s) before turning off peer-to-peer functionality. Dkt. 192 at 3-4. Indeed, Blizzard conflates the percentage of data distributed by peer-to-peer, as measured by Blizzard, with the extent of infringing use, but this is incorrect because of the participation of the CDNs and the peers storing the data distributed by CDNs in infringement. Dkt. 192 at 10, n.7. Blizzard's criticism is about the facts—the nature of infringement—and goes to the weight of Mr. Green's testimony but not its admissibility. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Blizzard also acknowledged that it did not provide (nor did it collect or retain) data regarding the number of Blizzard customers who opted out. Ex. 2 at 60:22-61:7. Nor did Blizzard provide any other evidence from near time of the 2006 hypothetical, such as documents, or deposition testimony, regarding how many Blizzard customers opted out in 2006 or Blizzard's expectations regarding future opt outs. Blizzard argues that ISP throttling of BitTorrent was well known in 2006, but Blizzard admitted in deposition that continued "upload throttling" by service providers was not a problem "any of us could foresee." *Id* at 66:25-67:3; See also 64:7-67:19. Blizzard asserts the parties would take into account that disabling peer-to-peer distribution could speed up download speeds for some users. Dkt. 192 at 11. But Blizzard's citation to a "support" article from December 2010—four and half years after the hypothetical negotiation—and a YouTube video from October 2008 that suggest that disabling peer-to-peer would increase download speed contradicts Blizzard's own documents from February 2006, September 2008 and November 2010. Ex. 3 at VIAVADIS002896, VIAVADIS002890, VIAVADIS002890. Indeed, Blizzard repeatedly told users that direct download disconnected from the swarm and was "not as fast as peer-to-peer." *Id.* This is a fact issue and goes to the weight and not admissibility of Mr.

7

Green's testimony. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

Contrary to Blizzard's assertion that he did not, Mr. Green still accounted for Blizzard's anticipated risk of declining use by applying various discount rates such that he does not rely on Blizzard's entire user base as his royalty base for a lump sum. Ex. 1 ¶¶ 270-275.  These discount rates go well beyond the time value of money to take into account Blizzard's perceived risk at the time of the hypothetical negotiation that use of the patented invention would decline over time. *See Kaufman v. Microsoft Corp.,* No. 16 CIV. 2880 (AKH), 2021 WL 242672, at \*7 (S.D.N.Y. Jan. 25, 2021)(expert relied on discount rates to "t[ake] into account that the parties might expect a decline in users over time."). "[T]he core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014); *See also*, *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001).  Consistent with Federal Circuit guidance, Mr. Green estimates Blizzard's extent of use at the time of the hypothetical negotiation in 2006.[10] *See e.g.*, Ex. 1  at ¶¶48; 218-240; 271-276.

Mr. Green's lump sum royalty analysis also takes into account the value of redundancy that the inventions of the '521 Patent provided Blizzard.  Ex. 1 at ¶¶ 238-239; *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080 (Fed. Cir. 1983) (lump sum royalty based on capacity appropriate where claimed method of making artificial snow was "insurance policy" for ski resorts

---

[10] Blizzard's reliance on *Enplas Display Device Corp. v. Seoul Semiconductor Co.* is unavailing because, unlike here, the expert therein included unaccused products in the royalty base on the grounds that the parties would have negotiated a "freedom to operate" license that included non-infringing past sales. 909 F.3d 398, 412 (Fed. Cir. 2018).  (Nonetheless, Blizzard's expert opines that the lump sum license the parties would negotiate here is a "freedom to operate" license.  *See*, Ex. 4 at ¶ 11.).  Blizzard also cites *AstraZeneca AB v. Apotex Corp.*, to assert Mr. Green improperly included all users.  Dkt. 192 at 10.  But AstraZeneca is inapposite because, unlike Mr. Green, the AstraZeneca expert included use from the period *after the asserted patent expired*. 782 F.3d 1324, 1343-44 (Fed. Cir. 2015).  And Blizzard's assertion that Mr. Green included all users in his lump sum analysis because he assumed "virtually all" users infringed is wrong.  Dkt 192 at 10; *cf* Ex. 1 at ¶ 294.

against inadequate snowfall); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009)("with some inventions … value is added simply by having the patented invention available for use.") Here, BitTorrent distribution (and seeding) could permit Blizzard to distribute files even if CDN distribution became impaired or catastrophically failed. Ex. 1 at ¶¶238-239; Ex. 2 at 80:15-81:8. Blizzard deployed software implementing the Asserted Methods to its customers (with the functionality turned on) because the more Blizzard's customers participated in BitTorrent distribution, "the faster everyone's individual download speed will be." Ex. 3 at VIAVADIS002896. Here again, Blizzard's complaints are directed to the weight and not admissibility of Mr. Green's testimony. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

### 2.   Mr. Green's Analysis of the Time Period in the Lump Sum Royalty Base is Reliable.

Blizzard argues that Mr. Green impermissibly includes time periods in the royalty base for a lump sum where no infringement occurred and ignores that in certain time periods usage was lower. Neither criticism provides grounds for exclusion. Blizzard relies heavily on *Insituform* and argues the Federal Circuit overturned a damages award where the expert included use from a time period of non-infringement. Dkt. 192 at 12-13. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 385 F.3d 1360, 1365 (Fed. Cir. 2004). But there is no indication *Insituform* involved a lump sum royalty, and so it provides no guidance in the present case.[11] To the contrary, in *Evolved Wireless, LLC v. Apple Inc.*, the court allowed a damages expert use of *forecasted* future infringing sales (occurring years after the trial date) in a lump sum analysis. No. CV 15-542-JFB-SRF, 2019 WL 1178517, at *3 (D. Del. Mar. 13, 2019). Indeed, Blizzard ignores the fundamental differences

---

[11] The remand for trial in *Insituform Techs* also involved due process concerns regarding "trial by affidavit" and the unique procedural history of that case that is not present here. *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1376 (Fed. Cir. 2004)

between a running royalty and a lump sum.  In *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, the Federal Circuit affirmed a jury's reasonable royalty award on a projected business plan from the time of the first infringement, despite evidence later showing that the actual sales did not meet those projections.  274 F.3d 1371, 1385 (Fed. Cir. 2001).  The court noted that "the negotiation must be hypothesized as of the time infringement began…" *Interactive Pictures*, 274 F.3d at 1384. The "fact that Infinite did not subsequently meet those projections [was] irrelevant to Infinite's state of mind at the time of the hypothetical negotiation…, Infinite's failure to meet its projections may simply illustrate the "element of approximation and uncertainty" inherent in future projections…," *Id.* at 1385. The Federal Circuit also noted that "if it had required sales projections to bear a close relation to actual sales revenue, it would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales…" *Id.*

Further, in *Aqua Shield*, the Federal Circuit vacated the District Court's royalty determination because it treated the infringer's actual profits as a royalty cap. *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014).  The Federal Circuit stated that post-infringement profits "may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits…" *Id.* at 770.  "The core economic question is what the infringer…would have anticipated the profit-making potential of the patented technology to be, compared to using non-infringing alternatives…" *Id.*  The Court also cautioned against replacing the forward-looking hypothetical inquiry into what the parties would have anticipated with a backward-looking inquiry into what turned out to have happened. *Id.* at 772; *See also, Lucent Techs.*, 580 F.3d 1301, 1326-27 (Fed. Cir. 2009) (generally discussing difference between lump sum and running royalty and noting "[p]arties agreeing to a lump-sum royalty

agreement may, during the license negotiation, consider the expected or estimated usage ...")

Contrary to Blizzard's assertion that he includes non-infringing activity, Mr. Green squarely addresses the extent of Blizzard's anticipated use at the time of the hypothetical negotiation in 2006. Ex. 1 at ¶¶48; 218-240; 271-276. And Blizzard has produced no evidence that in 2006 it forecasted it would stop using BitTorrent and the patented methods to distribute data in July 2016 or at any time before the patent expired. To the contrary, this would be inconsistent with the licenses Blizzard produced or the Federal Circuit guidance above about standard consideration in determining a lump sum.[12] *See also, Pers. Audio, LLC v. Apple, Inc.*, No. 9:09CV111, 2011 WL 3269330, at *4 (E.D. Tex. July 29, 2011)(describing allowability of lump sum license through patent life.) Blizzard's contemporaneous documents show Blizzard touted the use of peer-to-peer as important to its subscribers, and *expanded* it to subsequent games such as StarCraft II (released in 2010) and Diablo III (released in 2012.) Ex. 3 at VIAVADIS002896, VIAVADIS002890, VIAVADIS002890; Ex. 1 at Exhibit I. In 2012, Blizzard continued to invest in BitTorrent when it replaced the Blizzard Downloader with the Blizzard Agent distribution software. Ex. 2 at 133:13-134:6.

To the extent Blizzard argues that Mr. Green did not take into account declining use in the 2014-2016 time period, Blizzard is wrong. Mr. Green's discount rate analysis takes into account the risk that Blizzard might decrease use or stop use of the patented technology altogether. And in the later years included the analysis, for example 2014-2016, which are eight to ten years after the hypothetical negotiation, Mr. Green provided for a significantly heavier discount for these

---

[12] Contrary to Blizzard's assertions, Mr. Green's other analyses, including his running royalty calculation, do not consider potential usage of the patented technologies beyond 2016 because of the different nature of those inquiries. Dkt. 192 at 13; *Interactive Pictures*, 274 F.3d at 1384-85 (distinguishing running royalties); Ex. 1 at ¶¶ 202-11, looking at cost savings specifically from 2008-2016.) Indeed, Mr. Green discussed annual cost savings over the 15-year patent life as well. Ex. 1 at ¶¶ 212-213.

factors. Green Deposition 213:18-214:1; *See Kaufman*, 2021 WL 242672, at *7. Blizzard's argument that any damages model including a royalty base following September 2014 should be excluded should be rejected out of hand—Blizzard's use during this time period is undisputed.

Blizzard's criticisms go to the weight and not admissibility of Mr. Green's testimony.

**B.    Mr. Green Reliably Applies the BitTorrent Benchmarks to the Facts of this Case in Determining the Lump Sum Royalty Rate**

Blizzard incorrectly asserts that Mr. Green's use of the BitTorrent software benchmarks should be excluded as unreliable because Mr. Green (a) relied on BitTorrent software benchmarks not sufficiently tied to the facts of this case; and (b) did not apportion for the value of the benchmarks being advertising free; and (c) did not perform a profit split, which Blizzard asserts was required. To the contrary, Mr. Green's opinions follow well-established Federal Circuit guidance, are supported by the unchallenged opinions of Plaintiffs' technical expert, and explain the economic rationale for why the BitTorrent and μTorrent products provide a reliable benchmark. Mr. Green further correctly apportioned in light of the present facts, and correctly used the resulting implied market price (allocated profit) in his reasonable royalty analysis. Blizzard's criticisms go the weight and not the admissibility of his testimony. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d at 852.

**1.    Mr. Green's Standard Benchmark Methodology Reliably Applies Sufficiently Comparable Benchmarks**

Blizzard asserts Mr. Green did not follow an approved methodology in his benchmark analysis. Dkt. 192 at 14. Blizzard is wrong because Mr. Green followed well-established precedent in using the BitTorrent benchmarks. *See e.g. i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d at 855–56 (finding benchmark approach passed muster); *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1318 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online,*

*LLC*, 792 F.3d 1339 (Fed. Cir. 2015).  Indeed, benchmarks are routinely used in determining patent damages. *Id.*  For example, in *i4i Ltd. P'ship*, the Plaintiffs' damages expert evaluated royalties based on the retail pricing of third-party XML editing software that provided comparable functionality to the accused XML editing functionality in Microsoft's accused software products. 598 F.3d at 853.  In summary, Mr. Green's analysis focuses on the market price/allocated profit of the '521 Patented technology by identifying comparable BitTorrent products in the marketplace, technically apportioning to the '521 Patented features, and further apportioning to account for Blizzard's costs.  Ex. 1 at ¶¶ 244-257.

Blizzard argues the BitTorrent benchmarks are not sufficiently tied to the facts of this case because they were sold to non-Blizzard customers by third-parties ten years after the hypothetical negotiation date.  Dkt. 192 at 15.  As a threshold issue, Blizzard does not dispute that both the BitTorrent benchmarks are BitTorrent peer clients that implement the BitTorrent protocol for data transfer and storage.  Ex. 1 at ¶ 246.  BitTorrent, Inc., which was founded by Bram Cohen who released the BitTorrent Protocol, developed both products.  Ex. 1 at ¶ 246.  Blizzard ignores that Mr. Green relied on Plaintiffs' technical expert who explained that the "the main data transfer and storage functionalities" of the BitTorrent benchmarks "are closely related to the technologies described by the '521 Patent."  Ex. 1 at ¶254; *See Apple v. Motorola*, 757 F.3d at 1321 ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.").  Blizzard has not asserted that Plaintiffs' technical expert's opinions fail to meet *Daubert* standards.  Mr. Green also explained why the 2016 prices of these products (an advertising supported version of BitTorrent was available in February 2006) provide a conservative estimate of the 2006 market prices, and accounted for differences between 2006 and 2016 pricing. Ex. 1 at ¶ 249 He noted that, among other reasons, more expensive versions of these BitTorrent clients had

declined in price over time.  *Id.*[13]  In particular, Mr. Green's report explains how he is using 2016 pricing data to estimate the implied market price of the advertising-supported software available near the time of the hypothetical negotiation.  Ex. 1 at ¶ 251.  Courts have further permitted later-developed products to serve as benchmarks in a reasonable royalty analysis.  *See Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1369–70 (Fed. Cir. 2017).

Blizzard also points to no requirement that an appropriate benchmark must be purchased or developed by the infringer.  Dkt. 192 at 14.  To the contrary, Courts have upheld the use of third-party benchmarks in damages analyses.  *See e.g.*, *Kaufman*, 2021 WL 242672, at *7; *Content Guard Holdings, Inc. v. Amazon.com, Inc.*, No. 2:13-CV-1112-JRG, 2015 WL 11089749, at *6 (E.D. Tex. Aug. 6, 2015); .[14]  As in *Kaufman* and *Content Guard*, Mr. Green addressed the technical and economic rationales for the applicability of these benchmarks to Blizzard's use of the '521 Patented technology.  Ex. 1 at ¶¶ 244-255.

Blizzard's criticism regarding the benchmarks go to the weight and not the admissibility of Mr. Green's testimony.  *i4i Ltd. P'ship*, 598 F.3d at 854; *Apple v. Motorola*, 757 F.3d 1286 at ("Factually, if the [asserted benchmark] is not an accurate benchmark, [defendant] is free to challenge the benchmark or argue for a more accurate benchmark. But such an argument goes to evidentiary weight, not admissibility, especially when, as here, an expert has applied reliable methods to demonstrate a relationship between the benchmark and the infringed claims.").

### 2. Mr. Green Correctly Apportioned to the Use of the Infringing Technology.

Blizzard argues what while Mr. Green apportions to the '521 patented technology, he fails

---

[13] Indeed, Blizzard does not dispute that these
[14] The *Kaufman* benchmark products were third-party products, nor is there any discussion of Microsoft purchasing them.  See Ex. 6, Dkt. 205 in *Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2021 WL 242672, at *7 (S.D.N.Y. Jan. 25, 2021.)

to reliably do so. Blizzard agrees that Mr. Green reliably applied an 80% technical apportionment between the features of the benchmark BitTorrent software and the '521 Patented technology. Dkt. 192 at 15. But Blizzard argues more is required—that Mr. Green should have additionally apportioned for the feature of being "ad-free." To the contrary, Blizzard's argument makes no economic sense. Blizzard admits the only difference between the advertising supported and advertising free feature of the benchmark BitTorrent software is that the $4.95 version does not show pop up advertising. Dkt. 192 at 15-16. Thus, Blizzard ignores that customers were willing to pay $4.95 for the features present in the advertising free version, including the '521 Patented features. That BitTorrent, Inc. chose to monetize these features using different software versions, one advertising supported (i.e. customers paid by watching advertisements) and advertising free (customers paid in dollars), permitted Mr. Green to isolate this market price of the BitTorrent Benchmark peer software—which Mr. Green then apportioned to the '521 Patented Technology. *See* Ex. 5 at 128:21-129. Without expert or evidentiary support, Blizzard even suggests an alternative method of determining a benchmark price that involves an estimate of advertising revenues. Dkt 192 at 16, n.10. These criticisms go to the weight and not the admissibility of Mr. Green's apportionment testimony. *i4i Ltd. P'ship*, 598 F.3d at 852; *Bd. of Regents, The Univ. of Texas Sys. v. Ethicon, Inc.*, No. A-17-CV-001084-LY, 2020 WL 3580148, at *4 (W.D. Tex. Apr. 21, 2020).

As the Federal Circuit stated in *i4i Ltd. P'ship*, "[t]he existence of other facts [other than those relied upon by the expert] does not mean that the facts used fail[] to meet the minimum standards of relevance or reliability." *Id.* at 855-56.

### 3.    Mr. Green's Profit Allocation / Market Price is Reliable

Blizzard asserts Mr. Green's royalty rate opinions should be excluded because he did not

allocate the profit from the benchmark product between Blizzard and Plaintiffs in his determination of the royalty rate. Dkt. 192 at 17. But Blizzard mischaracterizes Mr. Green's opinion. Dkt. 192 at 17, n. 11. Mr. Green testified that his allocated profit analysis identifies the rate Blizzard would pay to license the Asserted Claims, namely the market rate. Ex. 5 at 209:11-210:2. *See e.g.*, *Kaufman*, 2021 WL 242672, at *7 (describing use of comparable products to identify royalty rate without split.) Mr. Green is not suggesting that Blizzard would charge this amount to its customers, and then split the resulting profit between itself and Plaintiffs. And Blizzard points to no case requiring the split of the market rate, or "allocated profit" as Mr. Green calls it, between the patentee and infringer in the context of this type of benchmark analysis. Blizzard reliance on *Summit 6* to suggest a requirement for such a profit split is unavailing because (a) *Summit 6* involved a split of projected profits from the defendant's sales of a covered product —a very different analysis; and (b) *Summit 6* never states such a split is required in the context of Mr. Green's analysis. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1297 (Fed. Cir. 2015).

Blizzard's arguments go to the weight and not admissibility of Mr. Green's testimony. *i4i Ltd. P'ship*, 598 F.3d at 852.

### C.    Mr. Green's Testimony Regarding Game Sales is Methodologically Sound and Not Excludable on *Daubert* Grounds.

Blizzard argues that Mr. Green's testimony regarding Blizzard computer game sales revenues under *Georgia-Pacific* Factor 6 should be excluded. But Blizzard ignores Mr. Green's opinion. As Blizzard acknowledges, Mr. Green did not rely on the sales revenues of Blizzard Games, as discussed in his report, in his specific royalty calculations.[15] Mr. Green did not assert convoyed or collateral sales, and so excluding this information on the grounds that it failed to meet

---

[15] Mr. Green's supplemental report included a supporting alternative analysis in which he used Blizzard's game unit sales produced in response to Plaintiffs' Motion to Compel to estimate the number of subscribers. Ex. 7, Green Supplement Rep. at Exhibit K-3.

convoyed or collateral sales requirements is improper.[16]    Rather, Mr. Green considered this information in formulating his opinions and this information is part of the background environment for his royalty analysis.[17]  *In re Maxim Integrated Prod., Inc.*, No. 12-244, 2015 WL 5311264, at *12 (W.D. Pa. Sept. 11, 2015).

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Blizzard's Motion to Exclude Mr. Green's testimony in its entirety.

---

[16] To the extent there are concerns about Mr. Green discussing the figures associated with Blizzard's game sales at trial, Plaintiffs are willing to meet and confer with Blizzard about their trial presentation of this information during the pretrial process.

[17] Ex. 7 at ¶ 9.

Dated: October 1, 2021                    Respectfully submitted,

By:     */s/ Gabriel R. Gervey*
        Andrew G. DiNovo
        Texas State Bar No. 00790594
        Gabriel R. Gervey
        Texas State Bar No. 24072112
        Adam G. Price
        Texas State Bar No. 24027750
        Daniel L. Schmid
        Texas State Bar No. 24093118
        Gregory S. Donahue
        Texas State Bar No. 24012539
        DINOVO PRICE LLP
        7000 N. MoPac Expressway, Suite 350
        Austin, Texas 78731
        Telephone: (512) 539-2626
        Facsimile:  (512) 539-2627
        adinovo@dinovoprice.com
        ggervey@dinovoprice.com
        aprice@dinovoprice.com
        dschmid@dinovoprice.com
        gdonahue@dinovoprice.com

        Robert J. Weltchek
        Weltchek Mallahan & Weltchek
        2330 West Joppa Road, Suite 203
        Luterville, Maryland 21093
        (410) 825-5287
        rweltchek@wmwlawfirm.com

        **ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was filed electronically on October 1, 2021. As such, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system. All other counsel of record not deemed to have consented to electronic service have been served by email.

*/s/ Gabriel R. Gervey*
Gabriel R. Gervey