UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **VIA VADIS, LLC and** § <br> **AC TECHNOLOGIES, S.A.,** § <br> *Plaintiffs* § <br> § <br> **v.** § <br> § <br> **BLIZZARD ENTERTAINMENT, INC.,** § <br> *Defendant* § | **CIVIL NO. 1:14-CV-00810-LY** |

# **O R D E R**

Before the Court are Defendant Blizzard Entertainment, Inc.'s *Daubert* Motion to Exclude Portions of the Expert Report of Philip Green, filed September 17, 2021 (Dkt. 192), and the associated response and reply briefs.[1] Having considered the written submissions, the applicable law, the case file as a whole, and the arguments of the parties at a hearing on December 13, 2021, the Court denies the motion.

## **I.   Background**

Via Vadis and AC Technologies, S.A. ("Plaintiffs") are the owner and exclusive licensee, respectively, of U.S. Patent No. RE40,521 (the "'521 Patent") for a data access and management system. They accuse Defendant Blizzard Entertainment, Inc. ("Blizzard") of making video game distribution software that infringes the '521 Patent. Amended Complaint, Dkt. 116.

The patent claims asserted by Plaintiffs cover the operations of peer-to-peer networks. Plaintiffs allege that Blizzard infringed the asserted claims by using the BitTorrent Protocol, a "peer to peer file distribution protocol that allows multiple networked users to simultaneously

---

[1] On November 8, 2021, the District Court referred Defendant's motion to the undersigned for resolution, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 209.

1

upload and download segments or pieces of the same file to and from each other." Dkt. 116 ¶ 14. Plaintiffs contend that Blizzard used BitTorrent to distribute certain of its video games, including the World of Warcraft, StarCraft, and Diablo series. *Id.* ¶ 17.

Blizzard now moves the Court to exclude portions of the report of Plaintiffs' damages expert, Philip Green, asserting that "they are based upon unreliable methods and legally insufficient facts, and because his methodology is not sufficiently tied to the facts of the case." Dkt. 192 at 4. Plaintiffs oppose the motion.

## II.   Legal Standard

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to provide that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Supreme Court has interpreted this rule as imposing a "gatekeeping role" on district courts, tasking them with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under *Daubert*, expert testimony is

admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The reliability prong mandates that expert opinion "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (citation omitted). "The relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* (internal quotation marks and citation omitted).

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The proponent of expert testimony bears the burden of establishing its reliability. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that it is reliable. *Moore*, 151 F.3d at 276. It is not the court's role to "judge the expert conclusions themselves." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018).

> That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages. This court has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are "for the jury."

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.").

### III.  Analysis

In his expert report, Green opined that the parties would have agreed to a lump sum reasonable royalty for use of the accused peer-to-peer technology, identified a reasonable royalty range, and stated that the royalty would be in the upper half of that range. Dkt. 192 at 8 (citing Green Report, Dkt. 193-1 (sealed) ¶¶ 290, 292). To arrive at the range, Green multiplied a royalty base calculated from "estimates of the forecasted [cumulative] number of users of the Accused Products from the perspective of the 2006 hypothetical negotiation" by a royalty rate calculated from the market value of a "benchmark product." *Id.* at 8-9 (footnote omitted). Green then applied a discount factor to reflect the present value as of the date of the hypothetical negotiation—that is, 2006—and then applied a range of discount rates. *Id.* at 9 (citing Green Report, Dkt. 193-1 ¶ 267).

Blizzard seeks to exclude certain of Green's royalty base opinions, royalty rate opinions, and opinions relying on or referencing sales or revenue of its games. The Court addresses each in turn.

A. **Royalty Base Opinions**

Blizzard's peer software connected to the BitTorrent swarm as the default mode. Dkt. 201 at 10. Blizzard now distributes its games entirely by content delivery networks ("CDNs") rather than peer-to-peer. Blizzard asserts that Green's royalty base fails to satisfy *Daubert* because:

> Green's assessment of his royalty base is neither reduced to exclude users who opted out of the accused peer-to-peer download functionality of the Accused Products[2] and relied upon only the non-infringing CDN direct download functionality, nor does it take into account the overwhelming evidence that the majority of Blizzard's games and updates were delivered by the Accused Products using the non-infringing CDN direct download functionality. Green also did not limit this royalty base to account for the fact that the accused peer-to-peer functionality was disabled for many Blizzard games beginning in 2014, nor does Green exclude the time-period after July 2016 when the accused peer-to-peer functionality was *completely* removed from *all* Accused Products.

Dkt. 192 at 9.

### 1. Download via Content Delivery Networks

First, Blizzard asserts that Green's award would inappropriately compensate Plaintiffs for non-infringing activity by including in his royalty base "estimated forecasts of users," including those who downloaded data directly via CDNs rather than peer-to-peer. Blizzard contends that its user base must be adjusted to exclude users of the non-infringing CDN systems. Blizzard further argues that Green's methodology is faulty because he failed to estimate and exclude Blizzard customers who turned off the accused peer-to-peer functionality before initiating downloads. Dkt. 204 at 7. Blizzard contends that Green thus failed to follow the methodology approved by the Federal Circuit Court of Appeals in *Summit 6*, on which he purports to rely.

---

[2] The "Accused Products" are software Blizzard developed, including the Blizzard Downloader, Blizzard Launcher, Blizzard Agent, and Blizzard's Battle.net. Dkt. 192 at 6.

Plaintiffs respond that CDN users are properly included in Green's calculation. In addition to peer-to-peer distribution by upload and download, Plaintiffs contend, BitTorrent includes distribution by peers referred to as "seeds," "Web seeds," or "HTTP seeds" that have all of the data to be distributed and only upload. Dkt. 201 at 5-6. Thus, "Blizzard's CDNs participated in infringement as Web Seeds/HTTP Seeds, and the Blizzard peers are 'data storage means' for the pieces obtained from the CDNs while connected to the Blizzard swarm." *Id.* at 10.

Both parties also make factual arguments addressing the number of Blizzard users who opted out of Blizzard's default peer-to-peer functionality. For purposes of Blizzard's *Daubert* motion, the Court agrees with Plaintiffs that the number of Blizzard customers properly included in Green's royalty base is a question of fact that will go to the weight to be accorded to Green's opinions, not to the correctness of his methodology or the admissibility of his opinions under *Daubert*. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").

### 2. Relevant Dates

Blizzard next argues that Green's award includes damages after Blizzard discontinued the peer-to-peer functionality feature in its Accused Products. Specifically, Green includes forecasts of users through December 2021, even though Blizzard "discontinued the accused peer-to-peer download functionality for some of its most popular games, like World of Warcraft, in September 2014." Dkt. 192 at 16. All use ceased in July 2016, so no activity infringing Plaintiffs' method patent could have occurred after that time, Blizzard argues. Because the ad-free versions of BitTorrent and BitTorrent product μTorrent were not available in 2006, the time of the hypothetical negotiation, Blizzard also argues that Green's benchmark does not follow the methodology of

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854-56 (Fed. Cir. 2010), and other reasonable royalty cases.

Plaintiffs respond that forecasted future infringing sales have been included in other lump sum analyses, hypothesized as of the time infringement began. Dkt. 201 at 13-14. Green addresses the extent of Blizzard's anticipated use at the time of the hypothetical negotiation in 2006, Plaintiffs assert. *Id.* at 15. "And Blizzard has produced no evidence that in 2006 it forecasted it would stop using BitTorrent and the patented methods to distribute data in July 2016 or at any time before the patent expired." *Id.* Plaintiffs also contend that it is reasonable to assume that Blizzard's use would extend through the life of the patent.

Blizzard contends in reply that Plaintiffs rely on cases in which lump sum awards were based on existing forecasts generated at or around the time of the hypothetical negotiation,[3] whereas Blizzard did not generate any forecasts of use of the accused peer-to-peer functionality; instead, Green developed his own forecasts. Blizzard argues that: "There is simply no factual basis for Green's departure from the accepted *methodology* of excluding time periods of non-infringement." Dkt. 204 at 8. Blizzard argued at oral hearing that Plaintiffs cite no case lacking an alleged infringer's forecast of use at the time of the hypothetical negotiation, while Plaintiffs argued that no case holds that such a forecast is required.

The parties have not cited a case specifically requiring a contemporaneous use forecast, and the Court finds that the absence of a contemporaneous use forecast by Blizzard does not render Green's methodology unreliable. The Federal Circuit has explained that the hypothetical

---

[3] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-27 (Fed. Cir. 2009); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001); *Evolved Wireless, LLC v. Apple Inc.*, 2019 WL 1178517, at *3 (D. Del. Mar. 13, 2019).

negotiation attempts "to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)). "In hypothetical-negotiation terms, the core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." *Id.* How accurately Green recreated what Blizzard may have anticipated about its future use of BitTorrent in 2006, including the duration of that use, goes to the weight of Green's testimony rather than its reliability.

*Lucent* is not to the contrary. *Lucent* does not concern the exclusion of evidence under *Daubert*; rather, the Federal Circuit found the jury's damages award not supported by substantial evidence, stating:

> Lucent submitted no evidence upon which a jury could reasonably conclude that Microsoft and Lucent would have estimated, at the time of the negotiation, that the patented date-picker feature would have been so frequently used or valued as to command a lump-sum payment that amounts to approximately 8% of the sale price of Outlook.

*Id.* at 1327. For purposes of Blizzard's *Daubert* motion, the Court finds that Green, in the absence of a use forecast by Blizzard, relied on substantial evidence sufficiently tied to deposition testimony from Blizzard's 30(b)(6) witness, John Yaney; certain of Blizzard's contemporaneous public statements; and licenses Blizzard has produced in this matter. *See* Dkt. 202-1 (sealed) ¶¶ 218-30, 270-76. Divergence of Blizzard's actual use from the forecast may illustrate the element of approximation and uncertainty inherent in future projections. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("Although a trier of fact must have

some factual basis for a determination of a reasonable royalty, consideration of a hypothetical negotiation necessarily involves an element of approximation and uncertainty.") (citation and internal quotation marks omitted). The Court does not find that Green's sales forecast is "based only on speculation and guesswork," *id.*, and therefore must be excluded. *See, e.g.*, *Motorola*, 757 F.3d at 1319-20 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponent through cross-examination.") (citation omitted).

### B. Royalty Rate Opinions

Green used a royalty rate of $1.58. BitTorrent and µTorrent were free of charge in 2006, the time of the hypothetical negotiation. In 2016, BitTorrent offered ad-free versions of both for $4.95 per user per year. Blizzard argues that Green's benchmark is not sufficiently tied to the facts of this case because it is derived from the $4.95 price charged in 2016, ten years after the hypothetical negotiation, "to non-Blizzard customers by third-party BitTorrent, Inc. for an 'ad-free' version of the Bit Torrent and µTorrent software clients, which are not accused." Dkt. 192 at 18.

To arrive at $1.58, Green first reduced the $4.95 price by 20% on the understanding that the asserted '521 Patent discloses 80% of the features in each of the two benchmark products. Dkt. 192 at 18. Green further reduced the allocated market price of the benchmark products by multiplying that figure by Blizzard's operating margin. *Id.*

Blizzard argues that Green fails to account for the "ad-free" feature of the benchmark products added in 2016, long after Blizzard began using them. Blizzard argues that Green's methodology thus deviates from *i4i*, *Motorola*, and *Kaufman v. Microsoft Corp.*, No. 16-cv-2880 (AKH), 2021 WL 242672 (S.D.N.Y. Jan. 25, 2021), which "involve benchmark products that the accused infringer developed or purchased or were available around the time of the hypothetical

negotiations." Dkt. 204 at 10. Blizzard also argues that Green deviates from accepted methodology by failing to address how profits would be allocated between Blizzard and Plaintiffs, distinguishing his methodology from that accepted in *Summit 6*, 802 F.3d at 1297, in which the parties would have split the allocated profits evenly to derive the actual reasonable royalty rate. Dkt. 204 at 11.

Plaintiffs respond that Green's analysis focuses on the market price/allocated profit of the '521 Patented technology by identifying comparable BitTorrent products in the marketplace, technically apportioning to the '521 Patented features, and further apportioning to account for Blizzard's costs. Dkt. 201 at 17 (citing Green Report, Dkt. 202-1 (sealed) ¶¶ 244-57). Green testified that his allocated profit analysis identifies the rate Blizzard would pay to license the asserted claims, namely, the market rate. *Id.* at 20. Plaintiffs cite *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1369-70 (Fed. Cir. 2017), in which the Federal Circuit affirmed the district court's admission of damages testimony that relied on a later-developed benchmark in a reasonable royalty analysis. *Id.* at 18.

In *Arctic Cat*, the Federal Circuit agreed with the district court's analysis that, to the extent the defendant found the comparison problematic, "that is a line of attack more appropriately addressed through cross-examination." *Id.* at 1370 (citation omitted). The Court finds the same is true of Blizzard's arguments with respect to the fact questions underlying Plaintiffs' royalty rate here.

## C. Game Sales

Finally, the parties agree that Green did not assert convoyed or collateral sales under *Georgia-Pacific* Factor No. 6,[4] which pertains to derivative or convoyed sales. Blizzard asks that "any

---

[4] "The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified by Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).

references to such Blizzard game sales or revenues should be stricken from Green's testimony." Dkt. 204 at 11.

Green states in his report that, "to the extent that effective distribution of Blizzard games and patches impacted players' willingness to buy additional games or pay ongoing subscription fees, Blizzard's use of the '521 Patented technology has contributed to Blizzard's revenues from game sales." Dkt. 193-1 (sealed) ¶ 172. Plaintiffs state that Green did not rely on the sales revenues of Blizzard games in his royalty calculations:

> Mr. Green did not assert convoyed or collateral sales, and so excluding this information on the grounds that it failed to meet convoyed or collateral sales requirements is improper. Rather, Mr. Green considered this information in formulating his opinions and this information is part of the background environment for his royalty analysis.

Dkt. 201 at 20-21 (footnote omitted). Plaintiffs add in a footnote that: "To the extent there are concerns about Mr. Green discussing the figures associated with Blizzard's game sales at trial, Plaintiffs are willing to meet and confer with Blizzard about their trial presentation of this information during the pretrial process." *Id.* at 21 n.16.

Because Green did not rely on the sales revenues of Blizzard's games in his royalty calculation, the Court denies Blizzard's motion to exclude Green's opinions that rely on game sales under Federal Rule of Evidence 703. The Court notes that Blizzard has filed a motion in limine to preclude Plaintiffs from introducing evidence regarding its video game sales, profits, and revenues, Dkt. 225 at 7-11, and also may address any such issues through pretrial agreement, as Plaintiffs have offered.

### IV. Conclusion

For the foregoing reasons, Defendant Blizzard Entertainment, Inc.'s *Daubert* Motion to Exclude Portions of the Expert Report of Philip Green (Dkt. 192) is **DENIED**.

**SIGNED** on December 14, 2021.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE